UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| John Harvey, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 23-cv-12798-ADB |
| vs. | ) | |
| | ) | |
| TriNetX, LLC, | ) | |
| Shields Carstarphen, | ) | |
| Jennifer Eagan, | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION TO (PARTIAL) MOTION TO DISMISS

Now comes the Plaintiff, John Harvey ("Harvey"), by his attorney, and OPPOSES herein

Defendants, TriNetX, LLC ("TriNetX"), Shield Carstarphen ("Carstarphen"), and Jennifer

Eagan's ("Eagan's"), motion to dismiss Counts III, IV, (portions of) V, VI, VII, VIII, and XI of

the First Amended Complaint.[1] Defendants have *not* moved to dismiss Counts I, II, (portions of)

V, IX, and X. Defendants' motion to dismiss Plaintiff's remaining claims is wholly without merit

and should be DENIED in its entirety because he has properly alleged Defendants:

1.  Retaliated against him for complaining about and otherwise opposing
    discrimination on the basis of religion in violation of Title VII of the 1964 Civil
    Rights Act and Mass.G.L. c. 151B (Counts III and V);

2.  Retaliated against him for asserting rights under the Family and Medical Leave
    Act and Massachusetts Paid Family and Medical Leave Act, for requesting

---

[1] On February 15, 2024, the Court Denied Defendants' motion to strike portions of Counts I and V as Moot (ECF Document No. 12). Regardless, as to FMLA retaliation (Count I), Harvey has clearly stated a claim as set forth below.

intermittent leave to attend medical appointments (Counts I and IV);

3.    Violated of the Massachusetts Wage Act by failing to timely pay him wages, including non-discretionary commissions which, were definitely determined and due and payable (Count VI);

4.    Breached their Implied Contract with him, the Covenant of Good Faith and Fair Dealing, and were otherwise Unjustly Enriched by failing to pay Harvey his earned commissions. (Counts VII and VIII); and

5.    Carstarphen and Eagan Intentionally Interfered with his employment with TriNetX, and did so with an improper motive, specifically a discriminatory and/or retaliatory animus (Count XI).

As an initial matter Plaintiff notes that Defendants failed to confer with undersigned counsel to attempt resolve or narrow the issues raised in their motion, a clear violation of Local Rule 7.1(a)(2). See, Martinez v. Hubbard, 172 F.Supp.3d 378 (D. Mass. 2016) (Woodlock, J.):

A Local Rule 7.1 certification is not an empty exercise. Local Rule 7.1 serves a meaningful dual role: it fosters discussion between parties about matters before they come before the court, and it preserves scarce judicial resources. Failure on the part of a litigant to comply with the rule not only affects the other parties, but it impedes the court's process as well.

Had counsel for Defendants conferred, the issues in their motion would have been narrowed, at least concerning portions of Counts I, III and V. Plaintiff additionally takes issue with Defendants' counsel's insertion of facts outside the pleadings, improper in a Rule 12 motion, "by way of background," in an attempt to improperly influence the Court.

## FACTUAL ALLEGATIONS.

Accepting, as required pursuant to Rule 12(b)(6), "all factual allegations in the complaint as true and draw[ing] all reasonable inferences in the plaintiff's favor," Desai v. Univ of Mass.,

Mem'l Med. Ctr., Inc., 415 F.Supp.3d 236, 238 (D.Mass. 2019), Harvey has clearly alleged, at

the very least, a plausible claim all each and every claim Defendants attempt to dismiss. See,

Garayalde-Rios v. Municipality of Carolina, 747 F.3d 15, 23 (1st Cir. 2014).

      Harvey is a devout Catholic. He suffers from Atrial Fibrillation and generalized anxiety,

conditions that substantially limit him in the major life activities of concentrating, sleeping,

communicating, and working. On April 22, 2019, TriNetX hired him as Sales Director, Pharma.

Until early 2023, he reported to SVP Tim Keliher, who reported to COO Brian Flaherty. During

this period, Harvey met or exceeded expectations. In the first quarter of 2022, he was promoted

to de facto Senior Director, Commercial Sales, still reporting to Keliher and Flaherty, and

overseeing a seven-person sales team. He continued to meet or exceed the performance

expectations, and exceeded sales goals. In early 2023, Carstarphen replaced Flaherty.

Throughout first quarter of 2023, despite numerous requests, neither Harvey nor his team were

provided with their 2023 compensation plans. This was despite Keliher's stating to Harvey that

he provided Harvey's plan to Carstarphen who stated she would approve the same with, at most,

"very minor tweaks." Keliher showed Harvey the plan after providing it to Carstarphen.

**Amended Complaint, ⁋⁋ 7-17.**

      On March 6, 2023, Harvey met with Carstarphen concerning a poor-performing

employee ("Employee 1"). Carstarphen stated that Employee 1 was not a fit and that the

separation process for the employee would commence. Carstarphen praised Harvey's handling of

the situation, and then provided him with highly positive feedback concerning his overall

performance. Later that day, Harvey met with Employee 1 at Employee 1's request, purportedly concerning a sales prospect. After very briefly discussing the prospect, Employee 1 falsely accused Harvey of workplace "bullying" and provided several false examples concerning the same. In addition to being categorically false, the allegations flew in the face of the lavish praise for Harvey that Employee 1 had submitted in their direct report comments on Harvey's performance evaluation in or around December, 2022. **Amended Complaint, ¶¶ 18-24.**

Harvey immediately telephoned Eagan, Vice-President of HR, and related what had occurred. Eagan told Harvey not to worry, that Employee 1 had been a problem "from day one" and "needs to go," and that "everybody knows" that Harvey would never engage in the conduct Employee 1 had accused him of. Harvey additionally telephoned Carstarphen, who responded in a similar fashion, likewise telling him not to worry. **Amended Complaint, ¶¶ 25-26.**

On March 17, 2023 Harvey met with Carstarphen and, in a complete reversal to both Carstarphen and Eagan's prior statements and assurances, she informed him that he would be required to undergo training on workplace bullying, and that he could have handled the matter differently. Carstarphen then questioned Harvey's desire to be in a leadership role with the company, and further stated, "I won't be able to bail you out like this every time, John!" Carstarphen ended the meeting by stating, "I think you have a lot of soul-searching to do, John." Carstarphen's tone throughout the meeting was aggressive and demeaning. While Harvey was completely blind-sided and taken aback by Carstarphen's statements, as a devout Catholic he was deeply shaken by her "soul-searching" remark. **Amended Complaint, ¶¶ 27-29.**

4

Following the meeting, Harvey experienced heart palpitations, insomnia, and other symptoms associated with work-related stress and anxiety. Stress and anxiety may contribute to increased episodes of atrial fibrillation. On March 19, 2023 Harvey emailed Carstarphen and two other TriNetX employees that he would be absent from work for several days that week "due to medical reasons." Despite this, Carstarphen sent him several emails requesting that he contact her and otherwise requesting business-related information. On March 20, 2023 Harvey met with his doctor, who provided a note excusing him from work from March 20-21. TriNetX and Eagan had been previously aware of Harvey's Atrial Fibrillation diagnosis. On March 21, 2023, Harvey transmitted an email to Eagan stating that his absences were due to "a confidential medical matter," that he would return to work the following day, and that he would be able to provide a doctor's note concerning the same. **Amended Complaint, ¶¶ 30-35.**

Also on March 21, 2023 Harvey emailed Eagan concerning the meeting with Carstarphen, specifically referenced the "soul-searching" remark, stating, "As a devout Catholic, the integrity of my soul is of extreme importance to me. I received this statement by Shields as being extremely offensive, hurtful, judgmental, and entirely unappreciated. I request that Shields please never speak to me like that again." He stated he would like to make a formal complaint against Carstarphen for "harassment and workplace bullying." **Amended Complaint, ¶¶ 36-37.**

On March 22, 2023 Harvey met with Carstarphen, who falsely accused him of failing to notify her of his absence, despite the above email regarding same, and criticized him for not responding to her emails while he was absent. He responded that he was unable to do so for

medical reasons. She chastised him for failing to inform her of the length of his absence, to which he responded that he did not know at the time. She falsely accused him of not notifying her that he would be returning to work that day. Finally, Carstarphen stated that Harvey's failure to communicate with her concerning his absence was "unacceptable," referenced his two-day absence as an "extended period," stating, "You didn't meet my expectations how to support the team during the time you were out." For his brief absence, Harvey had placed an away message on his email, directing individuals to Carstarphen. **Amended Complaint, ¶¶ 38-42.**

On March 23, 2023, at Eagan's request, Harvey emailed her his doctor's letter excusing him from work for March 20-21. At no other time during his employment was Harvey ever asked to provide documentation for such a short absence. Nor was he aware of any other employee being asked to do so. That day, Harvey met with Eagan, whereupon she accused him of "twisting" the complaint from Employee 1 into his allegations against Carstarphen, and further remarked that "everything" Carstarphen had stated to him at the March 22, 2023 meeting was what Eagan and TriNetX's attorneys had instructed her to say. Harvey reminded Eagan that both she and Carstarphen had initially supported him and assured him that he had acted properly concerning Employee 1. He further stated that he took great issue with Carstarphen's complete reversal regarding Employee 1, specifically referencing the "soul-searching" remark, and her treatment of him concerning his absence. **Amended Complaint, ¶¶ 43-45.**

Eagan then raised, for the first time, several false performance allegations against him. Toward the end of the meeting, Eagan asked Harvey what he "want[ed]." He responded by

requesting only that Carstarphen state that she was not targeting him, that she did not intend for her words to be received by him in the manner that they were, and agree to move forward together in good faith. Eagan responded by stating that she would schedule a lunch meeting with herself, Carstarphen, and Harvey for the following week, and that six months later they all would be "laughing our asses off about all of this." **Amended Complaint, ⁋⁋ 46-48.**

After further consultation with his doctors, on March 27, 2023 Harvey emailed Eagan informing her that he would be requesting "intermittent FMLA leave to attend appointments as needed" and requested information concerning next steps. He was never contacted by anyone at TriNetX, despite at least one follow up request. On March 27, 2023, Harvey also informed Carstarphen that he would be applying for intermittent FMLA. **Amended Complaint, ⁋⁋ 49-50.**

Two days later, on March 29, 2023 Harvey was called into a meeting with Eagan and Carstarphen whereupon his employment was terminated. Carstarphen gave contradictory reasons for Harvey's termination, initially stating that his position was being eliminated, then stating that he was being terminated because his relationship with Carstarphen had not been "going well." These stated reasons for Harvey's termination were false and a pretext for unlawful employment discrimination and retaliation. **Amended Complaint, ⁋⁋ 51-54.**

Eagan further stated to Harvey that she and Carstarphen had decided to compensate him for his first quarter 2023 sales commissions under his "old [2022] commission plan" as opposed to his 2023 plan because it "paid out better." Harvey had still not received his 2023 compensation plan. Upon information and belief, Defendants created Harvey's 2023

7

compensation plan after the fact to ensure significantly lower payments to him, in further retaliation for Harvey's above protected conduct. **Amended Complaint, ¶¶ 55-56.**

Based upon the 2023 plan shown to him by Keliher, Harvey would have received significantly higher first quarter commissions versus the 2022 plan. The plan shown to him from Keliher would have paid first quarter commissions in the approximate amount of $173,000. The precise amount of Harvey's unpaid commissions can be ascertained from information Defendants possess. TriNetX additionally terminated Harvey in order to deprive him of sales commissions he would have been otherwise entitled to. **Amended Complaint, ¶¶ 57-59.**

Harvey was given his purported 2023 compensation plan only after his termination. Upon information and belief, Defendants altered or amended the plan to deprive Harvey of sales commissions. TriNetX subsequently refused to compensate Harvey for his purported first quarter 2023 commissions, in the amount of $34,722.28, unless he executed a general release. Although terminated on March 29, 2023, Harvey did not receive his final paycheck until March 31, 2023. Harvey did not receive any sales commissions for 2023. He received a non-discretionary bonus payment for of $50,000.00, but long after his termination. TriNetX's obligation to pay Harvey sales commissions was non-discretionary. **Amended Complaint, ¶¶ 60-66.**

Subsequent to Harvey's termination, TriNetX alleged an altogether different reason for his termination from those stated at his firing, "poor treatment of female employees." This allegation was completely false and a further pretext for unlawful employment discrimination and retaliation. **Amended Complaint, ¶ 67.**

At all times relevant herein, Carstarphen and Eagan were managerial, supervisory and/or human resource employees and officers of TriNetX, having control over the terms and conditions of Harvey's employment. Defendants caused Harvey to suffer lost wages, lost income earning capacity, emotional distress, and to be otherwise damaged. **Amended Complaint, ▌▌ 68-69.**

I.    **ARGUMENT.**

A.    **RETALIATION UNDER VII OF THE 1964 CIVIL RIGHTS ACT AND MASS.G.L. C. 151B (COUNTS III AND V).**

As an initial matter, Harvey only alleges *retaliation* under Title VII and Mass.G.L. c. 151B and, contrary to Defendants' claims in their memorandum, has *not* included a claim for underlying religious-based discrimination or harassment.[2]

Title VII and c. 151B prohibit discrimination in employment on the basis of religion. 42 U.S.C. 2000e-2, G.L. c. 151B(4), and additionally prohibit employers from retaliating against an employee who "has opposed any practice made an unlawful employment practice …." 42 U.S.C. 2000e-3. See G.L. c. 151B s. 4(4). Retaliation is a distinct independent claim, not dependent on the viability of an underlying discrimination claim. Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991), Ruffino v. State Street Bank and Trust Co., 908 F.Supp. 1019, 1040 (1995), Verdrager v. Mintz, Levin, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 405 (2016). Under either statute, an employee is required to allege "(1) he engaged in protected conduct … ; (2) he

---

[2] Had counsel for Defendants conferred as required by Local Rule 7.1, this issue would have been resolved or narrowed and not be before the Court.

experienced an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse action." <u>Almeder v. Town of Bourne</u>, 922 F.Supp.2d 160, 169 (D. Mass. 2013), <u>Ruffino,</u> Supra, 908 F.Supp. at 1044. See, <u>Ritchie v. Dept. of State Police,</u> 60 Mass.App.Ct. 655, (2004).

**Protected Conduct.** Internal complaints of discrimination to supervisors/managers constitute protected activity. <u>Almeder,</u> Supra, 922 F.Supp.2d at 169. Here, Harvey has clearly alleged that he complained to Eagan, the head of HR, concerning Carstarphen's "soul-searching" remark, specifically stating in an email to her, just eight days before his termination,

> "As a devout Catholic, the integrity of my soul is of extreme importance to me. I received this statement by Shields as being extremely offensive, hurtful, judgmental, and entirely unappreciated. I request that Shields please never speak to me like that again." Harvey further stated that he would like to make a formal complaint against Carstarphen for "harassment and workplace bullying." **Amended Complaint ¶¶ 36-37.**

Defendants do not dispute Harvey failed to engage in protected conduct.

**Adverse Employment Action.** Defendants likewise do not dispute that Harvey alleged he suffered an adverse employment action (termination).

**Causal Connection.** A causal connection is properly established for Rule 12 purposed, *inter alia,* by alleging a temporal proximity between the protected conduct and the adverse employment action. See, <u>Decaire v. Mukasey,</u> 530 F.3d 1, 20 (1st Cir. 2008) ("temporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation'), quoting <u>Mariani-Colon v. Dep't of Homeland Sec. ex rel, Chertoff,</u> 511 F.3d 216, 224 (1st Cir. 2007) (period of two months between protected activity and termination sufficient to

meet prima facie burden). A factfinder is permitted to infer retaliation from the "timing and sequence of events." <u>Pontremoli v. Spaulding Rehabilitation Hospital</u>, 747 N.E.2d 1261 (Mass. App. Ct., 2000), quoting <u>Mole v. University of Mass., 442 Mass. 582, 592, 814 N.E.2d 329 (2004)</u>. Such an inference may be drawn "if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity," or "[w]here adverse actions follow close on the heels of protected activity...." *Id.* at 592, 595, 814 N.E.2d 329. Alternatively, a causal connection can be found in the circumstances of the employer's conduct following the protected activity, including "comments by the employer which intimate a retaliatory mindset." <u>Mesnick,</u> Supra, 950 F.2d at 828. Here, Harvey has sufficiently alleged both.

Harvey has clearly alleged that his termination came only *eight days* after his complaint to Eagan, and that he had been meeting or exceeding performance expectations. He alleged numerous comments by both Eagan and Carstarphen evidencing a retaliatory mindset. Just two days after Harvey's email to Eagan where he complained about the "soul-searching" remark and Carstarphen's "harassment," Eagan accused Harvey "twisting" the false allegations against him into his complaints against Carstarphen and, for the first time, made numerous false performance allegations against him. In aftermath of his complaint against her, Carstarphen falsely accused Harvey of failing to properly communicate his absence from work and the during of his absence as "unacceptable," and further accused him of failing to support his team.

Defendants falsely contend that Harvey did not alleged a causal connection between his

protected activity and termination because he did not "plausibly allege and connection between his termination and a comment that he needed to engage in soul-searching." This statement is demonstrably false regarding both the law and the facts alleged in the Amended Complaint. Factually, Harvey alleges, *inter alia,* that he was terminated not because of the soul-searching remark, *but because of his complaints to Eagan about the remark and how it affected him as a devout Catholic, and that he wished to pursue a harassment complaint against her.* Legally, Defendants are also in the wrong as they appear to be arguing that Harvey's retaliation claims fail because has was not terminated for discriminatory reasons. The U.S. Supreme Court has explained how the discrimination prohibition in Title VII differs from its retaliation provision:

> The substantive provision seeks to prevent injury based on who they are, i.e., their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2412, 165 L.Ed.2d 345 (2006), see also, Decaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008).

In the instant action, Harvey clearly and unambiguously alleged that he suffered an adverse employment action not because of who he is, i.e., but because of what he did, i.e., engage in protected conduct by complaining about the remark and how it affected him as a devout Catholic.

**Retaliatory Harassment.** Retaliatory harassment can constitute an adverse employment action under both statutes. Noviello v. City of Boston, 398 F.3d 76, 90-91 (1st Cir. 2005). Harvey has clearly alleged the retaliatory harassing conduct he received from Eagan and Carstarphen was sufficiently severe or pervasive to state a claim under both federal and state law. See,

Noviello, Supra, 398 at 92-94. Harvey has alleged subsequent to his complaint about Carstarphen's "soul-searching" remark and request to file a formal harassment claim against her, he was subjected to severe and/or pervasive harassment by Eagan and Carstarphen in the following eight days before his retaliatory discharge, including: false accusations of failing to notify Carstarphen of his absence and date of return, not responding to email while absent for medical reasons; engaging in "unacceptable" conduct regarding the same; false accusations of failing to "support the team" during the brief absence; requiring him to submit a doctor's note for his two-day absence; falsely accusing him of "twisting" the Employee 1 allegations into his complaint against Carstarphen; and raising, for the first time, false claims of performance issues.

**B.     RETALIATION UNDER THE FAMILY AND MEDICAL LEAVE ACT AND MASSACHUSETTS PAID FAMILY AND MEDICAL LEAVE ACT (COUNTS I AND IV).**

Although the Court Denied the motion to strike the FMLA retaliation claim, it parallels his PFMA retaliation claim so the two will be discussed in tandem. Contrary to Defendants' assertions, Harvey alleged only that he was *retaliated* against for asserting rights under the FMLA and PFMLA. He has *not* alleged a substantive violation, i.e., that he was denied leave or that Defendants interfered with his right to take leave.[3] See, Chacon v. Brigham & Women's Hosp., 99 F.Supp.3d 207, 214 (D.Mass. 2015) (employer who "terminates an employee for exercising or attempting to exercise her FMLA rights has committed a retaliatory act ….").

---

[3]  Once again, a simple Local Rule 7.1 conference in this regard would have save the Parties and the Court time and resources

Both the FMLA and PFMLA prohibit retaliation. 29 U.S.C 2615(a)(2); Mass.G.L. c. 175M s. 9. As with Title VII and c. 151B retaliation, the lack of a viable substantive underlying claim does not preclude an FMLA/PFMLA retaliation claim. Colburn v. Parker Hannifin, 429 F.3d 325, FN3 (1st Cir. 2005). A plaintiff is required to allege only that 1) he availed himself of rights protected by the FMLA or PFMLA, 2) he was subjected to an adverse employment action, and 3) there is a causal connection between the protected activity and the adverse employment action. Lopera v. Compass Grp. USA, Inc., 578 F.Supp.3 130, 136 (D.Mass. 2021). Requesting leave constitutes protected conduct. See, Chacon, Supra, 99 F.Supp.3d at 214-15, Daprato v. MWRA, 482 Mass. 375, 384-85 (Mass. 2019) (jury instruction that plaintiff fired for engaging in protected conduct of "taking leave or **requesting leave in the future**" was proper. Emphasis added). In Favreau v. Lib. Mut., Inc., 451 F.Supp.3d 150, 171-73 (D.Mass. 2020), Judge Young found the plaintiff sufficiently alleged protected conduct where she took time off from work without even specifically designating it as FMLA leave. Id.

Harvey clearly alleged he availed himself of the FMLA and PMLA by requesting intermittent FMLA leave. Likewise, the adverse employment action (termination) prong is, of course, met and Defendants  do not contest the same. See 458 CMR 2.16(3) (employee not required to actually file or reference PFMLA for anti-retaliation provision to apply).

Regarding the 'causal connection' element, as set forth above this is met by the temporal proximity between the request for leave and Harvey's termination, Germanowski v. Harris, 854 F.3d 68, 74 (1st Cir. 2017), and/or by the additional conduct of Defendants set forth above,

including the "twisting" accusation by Eagan, Carstarphen attempting to contact Harvey while

out for stated medical reasons, the false allegations that Harvey did not inform her of his

absences and date of his return to work, and referring to the same as "unacceptable." See

Favreau, Supra, 451 F.Supp.3d at 173 (negative comments concerning plaintiff's leave-taking

satisfied causal connection requirement). Chacon, Supra, 99 F.Supp.3d at 214 (employer to

terminates an employee who "terminates an employee for exercising or attempting to exercise

her FMLA rights has committed a retaliatory act ….").

### C.   MASSACHUSETTS WAGE ACT CONCERNING UNPAID AND LATE COMMISSIONS (COUNT VI).

The Massachusetts Wage Act, Mass.G.L. c. 149 § 148 was enacted to prevent an

employer from unreasonably detaining an employee's wages.  McAleer v. Prudential Ins. Co. of

Am., 928 F.Supp. 2d 280, 287 (D.Mass. 2013). It requires that employees be paid all wages owed

at the time of their termination. Reuter v. City of Methuen, 489 Mass. 465, 468 (2021).

In order to establish a claim under the Act, a plaintiff must show that (1) he is an employee; (2) the

payments sought are wages; and (3) those wages were not paid promptly after they became due.

See, Stanton v. Lighthouse Fin. Servs., Inc., 621 F. Supp. 2d 5, 10 (D. Mass. 2009). The

legislative purpose behind the Wage Act is to provide strong statutory protection for employees

and their right to wages." Crocker v. Townsend Oil Co., 979 N.E.2d 1077, 1086-1087 (Mass.

2012). The Act contains a prohibition against employers entering into a "special contract"

with employees to exempt them from its protections. Mass.G.L. c. 149 s. 148. See, Furtado v.

Republic Parking Sys., C.A. No. 19-cv-11481-DJC (D. Mass. Mar 02, 2020, p. 8), attached hereto as **Exhibit 1,** quoting Fraelick v. PerkettPR, Inc., 83 Mass.App.Ct. 698, 706 (2013). Prohibited special contracts typically involve "deducting, or withholding payment of, *any* earned wages." Camara v. Atty. Gen., 458 Mass. 756, 760 (2011) (emphasis in original).

Commissions are treated as wages under the Act if they are "definitely determined, and [have] become due and payable. G.L. c. 149 s. 148. Okerman v. VA Software Corp., 69 Mass.App.Ct. 771, 776 (2007). Bonuses that are non-discretionary or have been earned by an employee can be considered commissions and thus covered by the Wage Act to the extent they are definitely determined and due and payable. See, Israel v. Voya, C.A. No. 15-cv-11914 ADB (D.Mass. 2017), attached hereto as **Exhibit 2**. Harvey has clearly and sufficiently alleged that Defendants violated the Wage Act in numerous ways.

**Special Contact Violation.** As set forth above, Defendants withheld Harvey's purported 2023 commissions, set forth in the statement provided to him subsequent to his termination, in the amount of $34,722.28, unless he executed a general release. This is a clear violation of the Wage Act. See, Wilkie v. Nets, Inc., 20 Mass. L. Rptr. 8 176, 178 and FN7 (Mass. Super 2005), attached hereto as **Exhibit 3** (promise of payment of commissions "which the employer acknowledges it owes, conditioned on execution of a release" is a violation of the Act because such commissions "are to be paid, period").

**Failure to Pay on Date of Discharge Violation.** Harvey clearly alleged that 1) although terminated on March 29, 2023, he did not receive his final paycheck until March 31,

16

2023, a clear violation of the Act; and 2), Harvey clearly alleged that the non-discretionary

bonus payment of $50,000.00 was not paid to him until long after his termination.

**Failure to Pay any Commissions.** Finally, Harvey has clearly alleged that Defendants

failed to pay him his owed commissions in the approximate amount of $173,000. To the

extent Defendants contend that this amount was not "definitely determined," their argument

fails because Harvey has alleged that documentation and other information concerning the

precise amount of these commissions are in Defendants possession (and will be ascertained

in discovery). See, McAleer v. Prudential Ins. Co., 928 F.Supp.2d 280, 287 (D.Mass. 2013)

(precise amount of commissions not required where plaintiff alleged approximate amount

and stated precise amounts can be obtained through discovery).

In their motion, Defendants completely fail to address any of these Wage Act

violations, except to falsely claim Harvey failed to allege specific amounts owed. As set forth

above, he clearly did.

###    D.    BREACH OF IMPLIED CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (COUNTS VII, VIII).

As an initial matter, Harvey is  permitted to plead these claims in the alternative

pursuant to Fed.R.Civ.P. 8(d)(3). Implied contracts regarding employment may be inferred

from the conduct of the parties and from the attendant circumstances. Jackson v. Action for

Bos. Cmty. Dev., Inc., 403 Mass. 8, 13 (1988), Sullivan v. O'Connor, 81 Mass.App.Ct. 200,

212 (2012). That Harvey was an at-will employee is irrelevant to his claim for breach of

implied contract concerning the commission payments owed him, not whether he was actually employment pursuant to a contract of employment. Robinson v. Spencer Stuart, Inc., C.A. No. 13-10278-RWZ, p. 10 (D.Mass. 2013), attached hereto as **Exhibit 4**. Here, Harvey alleged he was provided representations by Keliher that Carstarphen had approved the proposed 2023 compensation plan that Kelliher had shown to Harvey with, at most, "very minor tweaks." Harvey alleged he continued working for Defendants based on these representations, but was not paid the approximately $173,000 in commissions owed under this plan.

An employer breaches the covenant of good faith and fair dealing when it terminates an employee, including an at-will employee, in bad faith in order to deprive them of earned commissions. Bohne v. Comput Assocs. Int'l, Inc., 514 F.3d 141,143 (1ˢᵗ Cir. 2008), citing Fortune v. Nat'l Cash Reg. Co., 364 N.E.2d 1251, 1257 (Mass. 1977). In the instant action, Harvey has alleged just that, i.e., that Defendants terminated him for false reasons in order to, *inter alia,* to deprive him of sales commissions he was otherwise been entitled to.

*Defendants have not moved for dismissal of the unjust enrichment claim.* Nevertheless, he has allege all required elements, i.e., 1) a benefit or windfall conferred upon the employer by the employee; 2) the employer's appreciation or knowledge of the benefit; and 3) retention of the benefit by the employer would be inequitable without payment to the employee. Fine v. Guardian Life Ins. Co., 450 F.Supp.3d 20, 35 (D.Mass. 2020). Harvey has sufficiently alleged just this, that TriNetX retained his $173,000 commission for 2023, that it was aware it was doing so as Harvey alleged that it changed or altered his comp. for this purpose, and that it

would be inequitable for TriNetX to be awarded this windfall.

### E.      INTENTIONAL INTERFERENCE WITH EMPLOYMENT (COUNT XI).

An employee may sue third parties, including managers, supervisors and co-workers, for their tortious interference with his or her employment relationship where: "(1) he had a contract [or employment relationship] with a third party; (2) the defendant knowingly induced the third party to break that contract [or employment relationship]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Ruffino v. State Street Bank and Trust Co., 908 F.Supp. 1019, 1050-51 (D.Mass. 1995), quoting Draghetti v. Chmielewski, 416 Mass. 808, 816, 626 N.E.2d 862 (1994). While claims regarding supervisor liability require actual malice, "[c]ertain situations lend themselves to proof of improper motive or malice in the context of a tortuous interference claim, such as a valid claim for unlawful discrimination …" or retaliation Bennett v. City of Holyoke, 230 F.Supp. 2d 207, 229 (D.Mass. 2002), Ruffino, Supra, 908 F.Supp at 1051-52. See, Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 77 (1st Cir. 2001). Whether or not a supervisor acted maliciously, "is a question that is consummately fact-bound." Ruffino, Supra, 908 F.Supp. at 1050-51.

Harvey has satisfied all of these elements, i.e., the existence of an employment relationship, Eagan and Carstarphen's conduct in inducing TriNetX to terminate him, their improper discriminatory and/or retaliatory motive, and harm resulting therefrom, i.e., termination. Defendants' sole argument regarding this claim, that Harvey failed to properly

allege malice on Eagan and Carstarphen's part, can be easily disposed of because Harvey has

clearly alleged that, in taking the actions they did against him, Eagan and Carstarphen "acted

with a discriminatory and retaliatory animus …."

### C.       CONCLUSION.

Because Harvey has clearly stated a cause of action concerning all claims Defendants

move to dismiss, the (partial) motion to dismiss should be DENIED in its entirety.

**PLAINTIFF RESPECTFULLY REQUESTS A HEARING**

> Respectfully submitted,
> John Harvey
> By his attorney,
>
> _____
> Paul F. Wood, BBO 565195
> Law Office of Paul F. Wood, P.C.
> 45 Bowdoin Street
> Boston, Massachusetts  02114
> P: (617) 532-2666
> F: (617) 532-2667
> pwood@paulwoodlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on this date this document filed through the ECF system will be sent
electronically to the registered participants as identified in the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants. /s/ Paul F. Wood